| | |
|---|---|
| ADAN HELIBERTO CARCAMO JUARES, individually and as Personal Representative for the Estate of Orlan Ariel Carcamo Navarro; and KEIDY PATRICIA CARCAMO NAVARRO, on behalf of minor child C.A.C.B., | |
|      Plaintiffs, | Case No. 22-cv-261 |
|      v. | **COMPLAINT DEMAND FOR JURY TRIAL** |
| THE GEO GROUP, INC., | |
|      Defendant. | |

## COMPLAINT

1.      Plaintiffs, by and through their attorneys of record, and for their Complaint against Defendant The GEO Group, Inc. ("GEO"), state:

### GENERAL ALLEGATIONS

2.      This case arises from GEO's intentional, reckless, and negligent tortious conduct leading to the death of Orlan Ariel Carcamo Navarro ("Mr. Carcamo"), a Honduran asylum seeker, by suicidal hanging in a medical cell at the Karnes County Family Residential Center ("Karnes") in Karnes County, Texas, on the night of March 17-18, 2020. During Mr. Carcamo's approximately 26 days of detention, GEO failed to adequately diagnose or treat him for depression, anxiety, and other mental distress while holding him in custody. Additionally, GEO employees knew of Mr. Carcamo's vulnerability due to past trauma and his increasing desperation caused by setbacks in his immigration case and his son's illness. Yet, GEO staff bullied and isolated him, causing him severe emotional distress. Furthermore, once GEO moved

Mr. Carcamo and his son, C.A.C.B., to the medical unit at Karnes to treat C.A.C.B.'s illness, GEO failed to secure a safe environment and did not ascertain Mr. Carcamo's location for nearly an hour on the night of his death, even as he prepared a noose and hung himself from his cell's shower rod. These acts and omissions – among others detailed below – led to Mr. Carcamo's death and caused C.A.C.B. severe and enduring emotional distress and trauma.

## PARTIES

3.    Plaintiff Adan Heliberto Carcamo Juares ("Adan Carcamo") is an adult and the father of the late Mr. Carcamo. He is the personal representative of Mr. Carcamo's estate. The estate has no debts, and distribution of estate property has been resolved, making the administration of the estate unnecessary. Adan Carcamo is a citizen of Honduras.

4.    Plaintiff Keidy Patricia Carcamo Navarro is the legal guardian of C.A.C.B., the minor son of Mr. Carcamo. At the time of Mr. Carcamo's death, C.A.C.B. was four years old. He is a citizen of Honduras, as is Keidy Carcamo.

5.    Defendant GEO is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida, and doing business throughout Texas. GEO is a multi-billion-dollar corporation that owns, leases, and/or operates 118 correctional and detention facilities with approximately 93,000 beds worldwide. As of December 31, 2020, GEO employed approximately 20,000 people and had consolidated revenues of $2.4 billion. GEO owns and operates the Karnes County Family Residential Center, where it detains noncitizens for U.S. Immigration and Customs Enforcement ("ICE") and provides medical and mental health services to detainees.

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332(a)(2). GEO is not a citizen of the same state as any Plaintiff, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in Karnes County, Texas, which is within the Western District of Texas.

## MR. CARCAMO'S PERSECUTION IN HONDURAS AND MEXICO

8.      Mr. Carcamo and C.A.C.B. sought asylum in the United States after extortion, torture, and death threats from a smuggler forced them to flee Honduras. The smuggler, affiliated with the Mexican Gulf Cartel, had previously transported Mr. Carcamo's partner to the United States after her former religious community persecuted her. Although Mr. Carcamo paid the full amount agreed upon to the smuggler for her transport, the smuggler later demanded an additional $2,000.

9.      Mr. Carcamo lacked the money to pay this additional fee, so the smuggler began to threaten Mr. Carcamo. He said that if Mr. Carcamo did not pay, he would massacre him and his children. Shortly after, the smuggler broke into Mr. Carcamo's house, hit him upside the head with a gun, held a machete to his neck, and sexually assaulted him. Mr. Carcamo believed that the smuggler thought he was homosexual. Two of Mr. Carcamo's children – C.A.C.B., then three years old, and M.E.C.B., then four or five years old – were home during this attack but hid from the smuggler.

10.     Mr. Carcamo reported the assault to the police, but had previously seen the responding officer associating and drinking beer with the smuggler. The officer asked Mr.

Carcamo to come to the station to file a report and then asked Mr. Carcamo to accompany him to several locations around town. Fearing that the officer might bring him to the smuggler or try to beat or assault him again, Mr. Carcamo refused to follow him.

11. Instead, Mr. Carcamo hid at his father's house. During this time, the smuggler called him at least fifteen times and left threatening voicemails. Fearing for his life and safety, Mr. Carcamo fled Honduras. He brought C.A.C.B. because the smuggler had seen them together, and Mr. Carcamo feared that he would harm his young son.

12. Mr. Carcamo and C.A.C.B. arrived in Tapachula, Mexico, and requested asylum. They waited seven months for the Mexican government to adjudicate their asylum claim.

13. The smuggler's associates tracked Mr. Carcamo to Mexico. On January 1, 2020, a man Mr. Carcamo knew to be the smuggler's cousin attempted to kidnap him. Mr. Carcamo resisted, and a crowd formed. The smuggler's cousin hit Mr. Carcamo in the head with a gun, knocking him unconscious, and left him on the street.

14. Weeks after this incident, the Mexican Government denied Mr. Carcamo's asylum claim, and he and C.A.C.B. traveled north to the United States.

15. Mr. Carcamo and C.A.C.B. presented themselves at the Presidio, Texas, port of entry and requested asylum. U.S. Customs and Border Protection transferred them to ICE custody at Karnes on February 21, 2020.

**GEO KNEW OF MR. CARCAMO'S FRAGILE MENTAL AND EMOTIONAL STATE CAUSED BOTH BY PAST TRAUMA AND SETBACKS IN HIS IMMIGRATION CASE**

16. GEO provided Mr. Carcamo with a mental health screening during his intake to Karnes.

17.     Upon information and belief, however, this screening was inadequate and failed to assess the full level of trauma that Mr. Carcamo had endured, as well as the level of treatment he required.

18.     While detained at Karnes, GEO was aware of – and overlooked – numerous hardships and setbacks faced by Mr. Carcamo that caused these old traumas to resurface and new tensions and anxieties to arise.

19.     For instance, less than one week after arriving at Karnes, Mr. Carcamo had a disastrous Credible Fear Interview ("CFI") with an Asylum Officer ("AO"). His pro bono attorney did not initially appear on the phone line, causing the interview to begin over an hour late. Once the interview started, the AO repeatedly expressed impatience and frustration due to the late start. Mr. Carcamo told the AO that he did not understand the interpreter and that he was upset that he did not have the opportunity to present evidence about his persecution. The AO dismissed these concerns. Mr. Carcamo ended the interview in tears.

20.     The next day, Mr. Carcamo received a notice of a negative finding for his CFI. He became distraught.

21.     Mr. Carcamo submitted a written request to GEO staff at Karnes on or about March 6, 2020, asking to speak with his ICE officer about his CFI. In this message to GEO, Mr. Carcamo wrote, "I didn't express myself clear[ly] in my first interview. I was scared and nervous."

22.     According to ICE's Detainee Death Report, that same week, Mr. Carcamo left a trauma group meeting with a GEO mental health worker after breaking down in tears discussing his CFI.[1]

---

[1] U.S. Immigr. & Customs Enf't, *Detainee Death Report: CARCAMO-NAVARRO, Orlan Ariel* 2 (2020), https://www.ice.gov/doclib/foia/reports/ddrCARCAMONavarroOrlanAriel.pdf (hereinafter ICE Death Report).

23.     Thus, GEO knew that Mr. Carcamo was distraught and that his emotional state was deteriorating following his CFI.

24.     Mr. Carcamo's distress compounded after an Immigration Judge ("IJ") reviewed his negative CFI finding in a hearing on March 11, 2020. In this hearing, Mr. Carcamo testified to the IJ about his sexual assault. Toward the end of his testimony, Mr. Carcamo said, "I would rather be here locked up [than] be deported to my country," underscoring the depth of his fear of returning to Honduras.

25.     The IJ, however, discounted Mr. Carcamo's testimony, including the way Mr. Carcamo's imputed sexuality factored into his persecution, and expressed doubt about Mr. Carcamo's sexual assault. When Mr. Carcamo's attorney attempted to respond to these concerns, the IJ audibly muttered, "Jesus…" under his breath. As the hearing went on, the IJ repeatedly acted in a hostile and antagonistic manner toward Mr. Carcamo and his attorney. The IJ abruptly ended the hearing, affirming the AO's negative credible fear finding as Mr. Carcamo stared impassively into space.

26.     Following this hearing, Mr. Carcamo began to pace around. Men detained with him reported that Mr. Carcamo appeared depressed. Mr. Carcamo told several men detained with him that he would "do something that might benefit all of [them]." When one man asked Mr. Carcamo what he was planning, Mr. Carcamo said, "You'll see."

**GEO'S RECKLESS AND INTENTIONAL CONDUCT DURING C.A.C.B.'S ILLNESS CAUSED MR. CARCAMO'S MENTAL AND EMOTIONAL HEALTH TO FURTHER DECLINE**

27.     Around March 14, 2020, C.A.C.B. fell ill. He developed diarrhea and vomited frequently.

28.     As a result of his illness, C.A.C.B. could not eat for several days. He developed dark circles around his eyes and became weak and fatigued. One man detained with Mr. Carcamo said that he "saw the little boy faint on one occasion, falling down completely as if he were dead."

29.     Mr. Carcamo became increasingly concerned about his son's illness, requesting medical care from GEO several times.

30.     Upon information and belief, GEO staff in the medical facility at Karnes only provided C.A.C.B. with acetaminophen or similar over-the-counter pain relievers.

31.     Indeed, Mr. Carcamo expressed his concern about the adequacy of medical care provided by GEO, telling another detained asylum-seeker, "[T]he only medical care the [GEO medical staff] give us families other than pills is locking people into medical isolation."

32.     A man detained with Mr. Carcamo reported, "Every time Orlan came out of medical, he was looking depressed and teary-eyed."

33.     Mr. Carcamo begged GEO medical staff to take C.A.C.B. to a doctor or clinic outside of Karnes for treatment. He submitted multiple written complaints and requests to GEO about seeking additional care for C.A.C.B.

34.     Guards and medical staff employed by GEO, however, failed to take Mr. Carcamo's pleas for assistance seriously. One time, Mr. Carcamo sought help from a GEO guard, but the guard simply asked if C.A.C.B. had been seen already in the medical clinic. When Mr. Carcamo answered in the affirmative, the guard scolded him, saying, "[S]top being a bother!"

35.     As C.A.C.B.'s sickness continued, Mr. Carcamo's mental health declined.

36.     GEO guards and employees enforced a strict policy under which parents and children must be in the same room at all times, which served to isolate Mr. Carcamo from the

friends he had made while in detention at a time when he needed their support and companionship most. The 2007 Family Residential Standards, in operation at the time of Mr. Carcamo's detention, classify a parent's failure to give care and proper attention to a child as a "moderate offense," but do not require a parent to be at their child's side at every moment.[2]

37.     Mr. Carcamo would try to take a few steps outside of his room to get fresh air and try to speak with the other men "because he was so anxious and nervous," according to another father detained with him. Each time he tried, GEO guards would force him back into his room. At one point, Mr. Carcamo shouted to his friends from a distance, "I just want to talk to you all. I just need somebody to talk to. I feel desperate in this room." A GEO guard overheard this outcry and immediately ordered Mr. Carcamo to return to his room.

38.     Another time, Mr. Carcamo tried to get the attention of a GEO guard when C.A.C.B. was suffering from a particularly severe bout of illness. He asked the guard for help, but the guard did not offer any aid and instead ordered Mr. Carcamo to return to his room.

39.     The isolation engendered by this policy and its rigid enforcement on Mr. Carcamo led to a precipitous decline in his mental health.

40.     It is unclear whether this policy was enforced uniformly or whether it was applied especially stringently against Mr. Carcamo. However, immigration detention is a form of civil detention, and is intended to be nonpunitive in nature. *See, e.g., Zadvydas v. Davis*, 553 U.S. 678, 690 (2001). According to ICE's 2007 Residential Standards, "[r]esidents do not receive any

---

[2] Immigr. & Customs Enf't, 2007 Family Residential Standards, 3.1 - Discipline and Behavior Managemnt [*sic*], VI.8, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_discipline_and_behavior_management.pdf.

discipline or punishment that is considered to be harsh, cruel, unusual, unnecessary, demeaning, or humiliating."[3]

41.     GEO guards acted unnecessarily and harshly by harassing and isolating Mr. Carcamo at a time when they knew he was especially vulnerable.

## THE WARDEN AT KARNES KNEW OF MR. CARCAMO'S FRAGILE MENTAL STATE BUT PUNISHED HIM RATHER THAN HELPING HIM

42.     One interaction between Mr. Carcamo and GEO staff became heated. When a guard instructed Mr. Carcamo, who was standing immediately in front of the door to his room in which C.A.C.B. slept, to go back inside, Mr. Carcamo asked to be left in peace and refused to return to his room. The guard went to find two other GEO employees. The three guards still could not convince Mr. Carcamo to go back inside, so they called for Ms. Rose Thompson, the warden of Karnes and a GEO employee.

43.     Other detainees in neighboring rooms observed Ms. Thompson's arrival and said, "Let [Mr. Carcamo] be, he's in bad shape." Ms. Thompson ignored this warning about Mr. Carcamo's fragile condition and told the other detainees to go away.

44.     Ms. Thompson ordered Mr. Carcamo to return to his room and then left to write him up for an infraction.

45.     A detained noncitizen who witnessed this interaction later said, "[Mr. Carcamo] had no choice [but to comply with Ms. Thompson's command], or it would clearly have gotten physical."

46.     GEO staff as high up as the Karnes warden knew of Mr. Carcamo's tenuous and declining mental state, given what the other detainees had told her, but she chose to treat him

---

[3] *Id.* at II.17.

punitively rather than provide him or his son the medical or mental health treatment that they required.

47. Indeed, one man detained with Mr. Carcamo reported, "The GEO employees were completely aware of [Mr. Carcamo's] desperate mental situation because of his child. [Mr. Carcamo] was constantly harassed by [GEO] staff members during the last four days" before GEO eventually transferred him and C.A.C.B. to medical isolation.

## GEO'S MENTAL HEALTH STAFF FAILED TO PROVIDE ADEQUATE TREATMENT AS MR. CARCAMO BEGAN TO MANIFEST SUICIDAL IDEATIONS

48. In the face of such treatment, Mr. Carcamo's mental health and emotional state worsened.

49. A man detained with Mr. Carcamo described an incident in which GEO guards discovered Mr. Carcamo crying in his room while drafting a written complaint to GEO. Following this incident, the man stated that Mr. Carcamo saw a "psychologist about four times."

50. Based on ICE's Detainee Death Report, Mr. Carcamo met with a licensed social worker on March 16, 2020, where Mr. Carcamo reported anxiety, insomnia, and nightmares.[4]

---

[4] *See* ICE Death Report, *supra* note 1, at 2. Plaintiffs and their counsel have repeatedly sought Mr. Carcamo's complete medical and disciplinary records from both GEO and ICE, but to date have not received them. While Mr. Carcamo was alive, Plaintiffs' attorneys requested his and C.A.C.B.'s medical records on February 25, 2020, using GEO and ICE's HIPAA-compliant medical request procedure. GEO failed to disclose the records at that point. Following Mr. Carcamo's death, Plaintiffs' attorneys submitted a request under the Freedom of Information Act ("FOIA") and the Texas Medical Privacy Act in October 2020. GEO replied, stating that it was exempt from such requests as a non-governmental entity. Subsequently, on April 19, 2021, Plaintiffs' attorneys submitted a FOIA request to ICE requesting Mr. Carcamo's medical records, resident file, and other documents in ICE's possession. ICE failed to respond to this request within the statutory period required by FOIA. Plaintiffs' attorneys are currently litigating ICE's improper withholding in a separate action in this District, *RAICES v. U.S. Immigr. & Cust. Enf't*, No. 5:22-cv-00171 (W.D. Tex. 2022). Finally, on November 22, 2021, Plaintiffs' attorneys once again submitted requests for Mr. Carcamo and C.A.C.B.'s medical records through GEO and ICE's HIPAA-compliant medical records request process. GEO and ICE again did not respond to the request within the statutory period required by HIPAA. The contents of Mr. Carcamo and C.A.C.B.'s medical records would aid Plaintiffs to further develop the claims contained in this complaint.

The social worker referred Mr. Carcamo for a psychiatric evaluation, noting "adjustment problems."

51.    The Emergency Medical Services ("EMS") paramedics who arrived at Karnes after Mr. Carcamo's eventual death noted – presumably from information gathered from GEO medical staff – that Mr. Carcamo's past medical history included "Psych/Behavior-Depression." Thus, GEO knew that Mr. Carcamo's condition was more serious than adjustment issues.

52.    Another man detained with Mr. Carcamo at Karnes reported that mental health care in the medical clinic merely consisted of questions about whether detained noncitizens ate and slept normally, and nothing more.

53.    Despite his meetings with mental health care professionals employed by GEO, Mr. Carcamo did not receive the mental health care he needed.

54.    Mr. Carcamo openly discussed suicide with the other detained men at Karnes. He told one man that he wanted to cut himself with a razor and inquired where he could find one.

55.    Under ICE's 2007 Family Detention Standards, staff at detention facilities "shall observe, on a daily basis, all residents for negative indicators, such as . . . depression . . . and changes in overall demeanor. Staff shall document and report such changes to the medical/mental health unit to follow up."[5] Additionally, staff "are trained to prevent suicide by recognizing potential risk signs and situations, and to intervene with appropriate sensitivity, supervision, referral, and treatment."[6]

---

[5] Immigr. & Customs Enf't, 2007 Family Residential Standards, 2.8 - Staff-Resident Communication, V.b., https://www.ice.gov/doclib/dro/family-residential/pdf/rs_staff_resident_communications.pdf.

[6] Immigr. & Customs Enf't, 2007 Family Residential Standards, 4.5 - Suicide Prevention and Intervention, 1, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_suicide_prevention_and_intervention.pdf.

56.    Despite ample evidence of Mr. Carcamo's worsening mental health, GEO staff failed to take the proper steps to prevent Mr. Carcamo's suicide and permitted an environment where his suicidal ideations could flourish.

**GEO FAILED TO ADEQUATELY SUPERVISE MR. CARCAMO AFTER PLACING HIM AND C.A.C.B. INTO MEDICAL ISOLATION, AND BECAUSE OF THIS NEGLIGENCE, MR. CARCAMO WAS ABLE TO TAKE HIS LIFE**

57.    For the last several days of Mr. Carcamo's life, GEO moved him and C.A.C.B. to a cell in the medical unit at Karnes to treat C.A.C.B.'s illness.

58.    This move further isolated Mr. Carcamo and caused his mental health to deteriorate. Despite GEO medical staff's knowledge of Mr. Carcamo's fragile mental state, GEO and its employees failed to give proper weight to Mr. Carcamo's declining mental health and feelings of isolation before moving him and C.A.C.B. to medical housing.

59.    At around 9:20 p.m. on March 17, 2020 – the last night of Mr. Carcamo's life – a nurse observed Mr. Carcamo and C.A.C.B. watching television and gave C.A.C.B. water. The nurse later reported that Mr. Carcamo appeared normal.

60.    Later, according to footage from GEO's security camera in the medical unit, Mr. Carcamo could be observed pacing around the room at approximately 11:00 pm. A nurse entered the room at approximately 11:12 p.m. to take C.A.C.B.'s temperature. Seven minutes later, at around 11:19 p.m., Mr. Carcamo walked over to the television and turned it off before getting into bed.

61.    During a cell check at around 11:35 p.m., a staff member turned on and off the lights. Just after the check, Mr. Carcamo got out of bed again and removed his sweater. Security footage then shows Mr. Carcamo picking up a white bed sheet, unfolding it, and tying a noose.

He can be seen testing the length of the sheet by holding one end in each hand and extending his arms out to the side.

62.     At approximately 11:40 pm, Mr. Carcamo carried the knotted bed sheet to the shower area of the cell, exiting the security camera's field of view.

63.     Either the GEO staff members monitoring the security camera were not concerned with the footage of Mr. Carcamo preparing a noose, or no GEO staff was watching the footage. Indeed, GEO staff did not notice anything amiss – or do anything to confirm Mr. Carcamo's location and safety – for nearly a full hour.

64.     At around 11:55 pm, GEO security staff conducted a purported wellness check, but did not turn on the lights or verify whether Mr. Carcamo was in his bed or in the restroom.

65.     A few minutes later, a nurse entered the room and took C.A.C.B.'s temperature again. The nurse noticed that Mr. Carcamo was not in his bed but took no further action to determine his whereabouts.

66.     Over half an hour passed before GEO staff checked in on the Carcamos again. At around 12:31 am on March 18, 2020, a staff member stood at the window of the cell, looking in. The staff member turned on the lights in the room, then turned them off a minute later. Over the next two minutes, the staff member returned twice to the cell, first turning the lights on and off again, and then opening the door and standing in the threshold. With the door open, she said, "*Señor*?" seeking to elicit a response from Mr. Carcamo.

67.     Based on this staff member's statement to the Karnes County Sheriff, she caught a glimpse of Mr. Carcamo hanging from the shower rod from her vantage point in the doorway to the cell. She did not, however, enter the room at that point, citing a policy prohibiting female

staff from entering male cells. This policy, which has no basis in the 2007 Family Residential standards, delayed a response to Mr. Carcamo's suicide.

68.     The female staff member eventually called in a medical emergency and requested a cut-down tool. The staff member then left the area and two nurses entered the cell at around 12:34 am, nearly a full hour after Mr. Carcamo was last seen alive during the 11:35 pm wellness check.

69.     Confirming Mr. Carcamo's location and wellbeing during this hour could have saved his life.

70.     Indeed, upon information and belief, most of the shower rod from which Mr. Carcamo hung himself would have been visible from the doorway of the cell if GEO staff had turned on the lights in the room or performed more than a perfunctory wellness check during that crucial hour.

71.     As the nurses entered the cell, C.A.C.B. awoke and sat up on his bed, witnessing the unfolding scene. A nurse took him out of the room, but not before he observed his father hanging from the shower rod.

72.     Several other GEO staff members arrived on the scene and later reported observing Mr. Carcamo hanging from the shower rod in his cell by a white sheet, with his feet dangling several inches above the ground. Two nurses lifted Mr. Carcamo's body up to relieve pressure on his neck. One of the nurses checked for a pulse but could not find one.

73.     A GEO staff member eventually arrived on the scene with a cut-down tool and a camera. After cutting him down, GEO staff performed two rounds of CPR on Mr. Carcamo, while the staff member with the camera recorded their attempts to revive him.

74.     At the same time GEO staff called the Karnes County EMS.

75.     GEO nurses connected Mr. Carcamo to an automated external defibrillator ("AED") and checked the placement of the AED pads. However, GEO had failed to properly maintain the AED, and the pads did not adhere to Mr. Carcamo's body. One staff member left the room to find a second AED.

76.     The failure of the AED to work properly delayed attempts to resuscitate Mr. Carcamo.

77.     At around 12:41, medical staff moved Mr. Carcamo from the shower area to the floor of his room, while continuing to administer CPR.

## GEO STAFF FAILED TO LET THE EMS PARAMEDICS INTO KARNES IN A TIMELY FASHION, FURTHER DELAYING MR. CARCAMO'S TREATMENT

78.     Karnes County EMS Unit 920 arrived at Karnes's south carport at around 12:42 am, minutes after being dispatched. One paramedic from Unit 920 reported arriving at Karnes without delay on their end.

79.     However, GEO had not unlocked the gate to the carport, so the EMS ambulance was unable to enter.

80.     EMS Unit 920 attempted to catch the attention of GEO staff by blaring the ambulance's sirens and blasting its horns. The ambulance's lights were already flashing, per emergency response practice.

81.     These efforts did not get GEO's attention, however, so Unit 920 had to call back to dispatch, which was then able to contact GEO staff. One paramedic reported, "GEO staff was able to manually open the gate after some delay."

82.     Later that night, a GEO staff member wearing a baseball cap, blue polo shirt, and khaki pants discussed the delay caused by the locked gate. She told the paramedics, "I don't know why it was closed. It shouldn't have been closed."

83.     GEO's failure to have the gate open interfered with the EMS unit's timely arrival at the scene.

84.     The mounting delays caused by GEO made a successful resuscitation of Mr. Carcamo less likely.

## MR. CARCAMO'S DEATH

85.     Once the EMS team finally reached Mr. Carcamo's room, the paramedics used an electrocardiogram on him and found his heart rhythm asystolic (otherwise known as cardiac standstill). One GEO staff member informed the EMS team of Mr. Carcamo's date of birth and medications that he had recently taken.[7] EMS paramedics placed a Lucas Device around Mr. Carcamo to facilitate chest compressions; intubated him in an attempt to resuscitate him; and injected intraosseous fluids directly into his right tibia. They also gave Mr. Carcamo one round of epinephrine.

86.     After Mr. Carcamo did not respond to these treatments, the EMS ceased all resuscitation attempts at around 12:55 am and called the Karnes County Justice of the Peace.

## AFTER MR. CARCAMO'S DEATH, GEO STAFF FAILED TO SECURE THE SCENE AND GAVE FALSE INFORMATION TO THE EMS PARAMEDICS

87.     Three officers from the Karnes County Sheriff's Department arrived at Karnes at around 1:27 am on March 18, 2020. The officers brought a camera to document their investigation, and others had body cameras activated.

88.     The Karnes County Sheriff's Department provided Plaintiffs' attorneys with footage taken at Karnes on the night of Mr. Carcamo's death.

---

[7] ICE's Detainee Death Report notes that Mr. Carcamo had received antibiotics and pain relieving medication. Plaintiffs are awaiting Mr. Carcamo's complete medical records in order to determine whether he had been treated with any other medications prior to his death. *See* ICE Death Report, *supra* note 1, at 2.

89.     One of the EMS paramedics, identified as "Paul,"[8] met the officers at the carport and informed them that GEO staff told him that they last saw Mr. Carcamo alive at 12:28 am and then found him hanging two minutes later, with his feet dangling several inches off the ground. Paul expressed doubt about GEO's statement that Mr. Carcamo had only been hanging for two minutes, but told the officers, "That's how [GEO's] numbers showed up. I even reconfirmed it and they said that's how their numbers are."

90.     "Sergeant Reynolds," one of the responding officers from the Karnes County Sheriff's Department, led the other two officers into the medical unit and spoke with GEO staff at the nurses' station. A male GEO employee, introduced as "Major Jensen," led the officers down the hall to the Carcamos' room in the medical unit. The room was located only a short distance from the nurses' station – possibly only 20 or 30 feet away – on the same hallway. It had a window slit in the door and a larger window on the wall.

91.     Sergeant Reynolds told Major Jensen not to allow anyone else into the room until the sheriff's investigator arrived. Then, he led the two other officers into the room.

92.     After briefly inspecting the scene and pulling the sheet covering Mr. Carcamo's body back, Sergeant Reynolds and the other sheriffs exited the room. A tall, gray-haired male GEO employee referred to as "Quintero" locked the door behind them and stood guard.

93.     Sergeant Reynolds again told the GEO staff in the area, including Quintero, not to let anyone else into the room.

94.     The officers returned to the nurses' station to speak with the paramedics. A short, bearded paramedic identified as "Mike" again told Sergeant Reynolds that GEO said Mr.

_____

[8] All names in this section come from video footage obtained from the Karnes County Sheriff's Department. Plaintiffs currently lack the full names of most employees of the Sheriff's Department, EMS paramedics, GEO employees, and ICE staff mentioned herein, and refer to them by the names, although incomplete, that were used in the footage.

Carcamo was last seen alive at 12:28 am, and that he was found hanging two minutes later at 12:30 am. Mike also explained that GEO told him that Mr. Carcamo did not seem upset, did not show any signs of anxiety, or display any suicidal ideation.

95.     Both crucial facts were false. GEO's logs do not show any wellness checks or other encounters with Mr. Carcamo at 12:28 am. Furthermore, Mr. Carcamo had shown signs of anxiety beginning with his isolation at the start of C.A.C.B.'s sickness, through the previous day when he reported it to the GEO social worker.

96.     A woman's voice, outside the field of view of the sheriffs' cameras, again stated that nobody was allowed into the Carcamos' room. A few minutes later, a male voice, also off camera, confirmed with Sergeant Reynolds that the room must be sealed until the sheriff's investigator arrived.

97.     Multiple GEO staff members thus knew that they must not allow anyone into Mr. Carcamo's room until the sheriff's investigator arrived.

98.     At around 1:49 am, Karnes County Justice of the Peace Caroline Korzekwa ("Judge Korzekwa") arrived. She spoke with the officers and paramedics for several minutes. Sergeant Reynolds told her that the sheriffs would only allow her into the Carcamos' room once the sheriff's investigator arrived. She asked how long that would be, and Sergeant Reynolds replied that it could be another half hour.

99.     Two of the officers from the Karnes County Sheriff's Department chatted with one another as they waited in the corridor. One of them expressed surprise that Mr. Carcamo was able to commit suicide in the medical unit, saying, "I would think this [area] would be watched more than any other place around, that they're probably constantly checking on [the detainees]."

100. Later, the two officers expressed confusion over GEO's false report, conveyed to them by the EMS paramedics, that GEO staff members had checked on Mr. Carcamo only two minutes before they found him hanging in the shower area.

101. At around 2:25 am, Judge Korzekwa walked away from the nurses' station, heading in the direction of the Carcamos' room. She remained out of view of the sheriffs' cameras for approximately 90 seconds. When she returned, the officer with the camera indicated to the other officer that Judge Korzekwa had entered the Carcamos' room, despite explicit instructions to wait for the sheriff's investigator to arrive. He said, "I know [Sergeant Reynolds] told her, 'We're waiting for an investigator,' and she didn't want to wait."

102. The other officer replied, "Do I note it down that she went in there?"

103. The officer with the camera said, "You can make a note of it."

104. Shortly after 3:00 am, the Karnes County Sheriff's Department investigator, identified as "Ramirez," arrived, carrying brown paper evidence bags. He entered the Carcamos' room, accompanied by Sergeant Reynolds and the officer with the camera. He took still photos of the room and of Mr. Carcamo's body. Then, he walked back to the threshold to speak with GEO staff who had congregated by the door. He asked them who had entered the Carcamos' room prior to the officers.

105. A GEO nurse said that she and other medics had entered the room, as well as the EMS paramedics, to attempt lifesaving measures.

106. Then, Quintero, the GEO employee who stood guard over the room, said that Judge Korzekwa had also entered.

107.     Investigator Ramirez turned to him and said, "The [Justice of the Peace] doesn't come in here if there's a scene like this. We're first . . . Because if this had been foul play, that means the scene had been contaminated."

108.     Quintero then said that Judge Korzekwa had lifted a handle of some object in the room.

109.     The officers went back into the Carcamos' room to continue their investigation. While looking at Mr. Carcamo's body, one of the sheriffs also said that, based on Mr. Carcamo's injuries, he must have been hanging for quite a while with his feet off the ground. This contradicts GEO's account that Mr. Carcamo was found hanging only two minutes after staff last saw him alive.

110.     GEO and its employees provided false information to the EMS paramedics about their final encounters with Mr. Carcamo, and also failed to secure the scene, potentially hindering the investigation.

**GEO'S ACTIONS CAUSED C.A.C.B. SEVERE EMOTIONAL DISTRESS**

111.     Following his father's death, C.A.C.B. was transferred from Karnes to a shelter licensed by the Office of Refugee Resettlement in San Antonio, Texas, where he spent approximately six months. He was only four years old at the time, and isolated from all family.

112.     C.A.C.B. returned to Honduras by voluntary departure in September 2020. The Honduran government granted C.A.C.B.'s aunt, Keidy Carcamo, legal custody over him.

113.     Back in Honduras, C.A.C.B. is fixated on his father's death. C.A.C.B. rarely talks about anything apart from his father. He brings up his father's death during casual conversations, saying that he witnessed his father die, saw his eyes close slowly, and did not know what to do.

114.    Apparently confusing the uniformed GEO employees at Karnes cutting down Mr. Carcamo and attempting CPR with police, he says, "My dad died by police. He isn't here." This has led C.A.C.B. to fear the police and other uniformed officials in Honduras.

115.    When C.A.C.B. recounts what happened to his father, his eyes get wide, his body shakes uncontrollably, and he balls his hands into fists. C.A.C.B. does not play well with other children because he often only talks about his father's death.

116.    Sometimes, C.A.C.B. has nightmares about his father, and he falls ill after these dreams. For the first several months after returning to Honduras, he was unable to sleep through the night.

117.    C.A.C.B. has also developed a number of behavioral and emotional problems. Keidy Carcamo reports that it is difficult for him to be happy; he often walks around with an emotionless or sad face. C.A.C.B. also has difficulty concentrating. When his aunt calls for him, he does not respond and stares into space. He recently began experiencing fits of anger, in which he lashes out at, and hits, his younger sister.

118.    Keidy Carcamo believes that C.A.C.B. is traumatized by witnessing his father's death, but she lacks the resources to take him to a psychologist or therapist.

### COUNT I – NEGLIGENCE (WRONGFUL DEATH) ON BEHALF OF PLAINTIFFS ADAN CARCAMO AND KEIDY CARCAMO ON BEHALF OF C.A.C.B.

119.    The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

120.    C.A.C.B., by and through his legal guardian Plaintiff Keidy Carcamo, is the surviving son and a legal beneficiary of Mr. Carcamo ("Decedent").

121.    Adan Carcamo is the father and a legal beneficiary of Orlan Carcamo.

122.    Decedent died as a result of GEO's wrongful conduct.

123.     Decedent would have been entitled to bring this action against GEO if he had lived.

124.     GEO had physical custody and control of Mr. Carcamo at the time of his death, and also controlled Mr. Carcamo's access to medical and mental health care. In this capacity, GEO owed Mr. Carcamo a duty of care.

125.     GEO breached its duty of care. It failed to maintain an operational AED, did not promptly open its carport gate for the EMS paramedics, did not consider Mr. Carcamo's mental health when moving him to the medical unit, and promulgated policies that delayed responses to Mr. Carcamo's suicide, among other lapses.

126.     GEO's negligent and otherwise wrongful conduct proximately caused the death of Mr. Carcamo.

## COUNT II – MEDICAL MALPRACTICE
## FAILURE TO PROVIDE ADEQUATE MEDICAL AND HEALTH CARE
## (SURVIVORSHIP ACTION ON BEHALF OF PLAINTIFF ADAN CARCAMO)

127.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

128.     Plaintiff Adan Carcamo represents the estate of Mr. Carcamo and as such may bring a survivorship action on Mr. Carcamo's behalf. The estate has no debts, and distribution of estate property has been resolved, making administration of the estate unnecessary.

129.     Before dying, Decedent had a cause of action for medical malpractice which he could have brought against GEO.

130.     GEO operates the medical unit at Karnes and employs or contracts the medical staff therein, and as such constitutes a health care provider.

131.    GEO had physical custody over Mr. Carcamo, and had sole and complete control over Mr. Carcamo's access to mental health care.

132.    GEO owed a duty of care to Mr. Carcamo to provide adequate mental health care and supervision.

133.    GEO and its employees breached their duty of care by failing to properly diagnose Mr. Carcamo's condition, and by failing to properly provide Mr. Carcamo the mental health care that he required. For instance, GEO employees knew or should have known about Mr. Carcamo's fragile and worsening mental state based on the past trauma that he had suffered, the written complaints that he submitted, his own reports of nightmares and anxiety, his statements of desperation, and the times he broke down crying, among other warning signs. However, upon information and belief, GEO never identified Mr. Carcamo as a potential suicide risk or provided him the additional treatment he required for depression or suicidal ideation or other mental health issues that may have led to his suicide.

134.    GEO's breach of this duty caused Mr. Carcamo's death.

### COUNT III - MEDICAL MALPRACTICE
### FAILURE TO PROVIDE A SAFE ENVIRONMENT
### (SURVIVORSHIP ACTION ON BEHALF OF PLAINTIFF ADAN CARCAMO)

135.    The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

136.    Plaintiff Adan Carcamo represents the estate of Mr. Carcamo and as such may bring a survivorship action on Mr. Carcamo's behalf. The estate has no debts, and distribution of estate property has been resolved, making the administration of the estate unnecessary.

137.    Before dying, Decedent had a cause of action for medical malpractice, which he could have brought against GEO.

138.     GEO operates the medical unit at Karnes and employs or contracts the medical staff therein, and as such constitutes a health care provider.

139.     GEO had a duty to provide a safe environment for Mr. Carcamo and C.A.C.B. by monitoring and supervising them to prevent harm while C.A.C.B. was under medical observation and Mr. Carcamo was suffering from mental distress.

140.     GEO breached this duty of care by – among other actions alleged above – failing to observe its security cameras and ascertain Mr. Carcamo's location for nearly an hour on the night of his death. Mr. Carcamo's preparations for his suicide were visible on the security camera footage, and at least two GEO employees entered Mr. Carcamo and C.A.C.B.'s medical cell without attempting to locate Mr. Carcamo during this time.

141.     GEO's failure to provide sufficient supervision in the medical unit at Karnes created an unsafe environment which enabled Mr. Carcamo to take his own life.

### COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (SURVIVORSHIP ACTION ON BEHALF OF PLAINTIFF ADAN CARCAMO)

142.     The allegations contained in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

143.     Plaintiff Adan Carcamo represents the estate of Mr. Carcamo and as such may bring a survivorship action on Mr. Carcamo's behalf. The estate has no debts, and distribution of estate property has been resolved, making the administration of the estate unnecessary.

144.     Before dying, decedent had a cause of action for Intentional Infliction of Emotional Distress, which he could have brought against GEO.

145.     GEO intentionally or recklessly took the actions detailed above. GEO guards and staff knew or should have known about Mr. Carcamo's deepening mental anguish, yet they

continued to bully and harass him even after finding him crying in his room and after he told them about his feelings of desperation.

146.     GEO's conduct was extreme and outrageous.

147.     As a result of GEO's actions, Mr. Carcamo suffered severe emotional distress, trauma, and anguish.

148.     No alternative cause of action would provide a remedy for the severe emotional distress caused by GEO's conduct.

### COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON A BYSTANDER ON BEHALF OF PLAINTIFF KEIDY CARCAMO ON BEHALF OF C.A.C.B.

149.     The allegations in the preceding paragraphs are repeated and re-alleged as if fully set forth herein.

150.     GEO intentionally or recklessly took the actions detailed above. GEO failed to monitor the Carcamos' cell in the medical unit, which enabled Mr. Carcamo's suicide. GEO also failed to prevent C.A.C.B. from witnessing his father hanging. As a result, C.A.C.B. witnessed his father dying.

151.     GEO's conduct was extreme and outrageous.

152.     As a result of GEO's actions, C.A.C.B. suffered severe emotional distress. C.A.C.B. was traumatized by his father's death and continues to experience serious emotional and behavioral problems. He frequently discusses his father's death, suffers nightmares, has difficulty concentrating, does not socialize well with other children, and experiences physical symptoms of trauma.

153.     No alternative cause of action would provide a remedy for the severe emotional distress caused by GEO's conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A. An award to Plaintiffs of compensatory damages, including but not limited to damages for emotional distress, psychological trauma, and mental anguish;

B. An award to Plaintiffs of exemplary/punitive damages;

C. An award to Plaintiffs of their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs, as provided by law;

D. Pre-judgment and post-judgment interest, as provided by law; and

E. Granting Plaintiffs other and further relief as this Court finds necessary and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this Complaint.

Dated: March 17, 2022

Respectfully submitted,

*/s/Daniel Hatoum*
Daniel Hatoum
Refugee and Immigrant Center for
Education and Legal Services (RAICES)
802 Kentucky Ave.
San Antonio, TX 78201
(210) 610-6852, ext. 337
daniel.hatoum@raicestexas.org

**CERTIFICATE OF SERVICE**

I, Daniel Hatoum, attorney for the Plaintiffs, certify that on the 17th day of March, 2022, I

caused to be deposited in the United States Mail by Certified U.S. Mail to The GEO Group, Inc.

a copy of the **Complaint and Demand for a Jury Trial** at the following address:

The GEO Group, Inc.
c/o Corporate Creations Network
5444 Westheimer #1000
Houston, TX 77056

Dated: March 17, 2022                                 _____/s/ Daniel Hatoum_____
                                                              Daniel Hatoum
                                                              Attorney for the Plaintiff